1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2         FORT PIERCE DIVISION
     CASE NO.  15-14059-CR-JEM
3

4

5    UNITED STATES OF AMERICA,

6              Plaintiff,

7         vs.

8                                    Fort Pierce, Florida
                                     May 12, 2016
9    JEFFREY BRIAN MOBLEY,           Pages 1-49

10             Defendant.
     _____

11

12        TRANSCRIPT OF SENTENCING HEARING
     BEFORE THE HONORABLE JOSE E. MARTINEZ
13        UNITED STATES DISTRICT JUDGE

14

     APPEARANCES:
15

     FOR THE PLAINTIFF:
16                        *United States Attorney's Office*
                          BY:  CARMEN LINEBERGER, A.U.S.A.
17                        101 South US Highway One
                          Suite 3100
18                        Fort Pierce, Florida 34950

19

     FOR THE DEFENDANT:
20                        *Federal Public Defender's Office*
                          BY:  PANAYOTTA AUGUSTIN-BIRCH
21                        109 North Second Street
                          Fort Pierce, Florida 34950
22

23   REPORTED BY:         DAWN M. SAVINO, RPR
                          Official Court Stenographer
24                        400 N. Miami Avenue, 10S03
                          Miami, Florida  33128
25                        Telephone:  305-523-5598

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

```
1                    P-R-O-C-E-E-D-I-N-G-S

2            COURTROOM DEPUTY:  Case number

3    15-14059-criminal-Martinez, United States of America versus

4    Jeffrey Brian Mobley.

5            Counsel, please state your appearance.

6            MS. LINEBERGER:  Good morning, Your Honor.  Carmen

7    Lineberger on behalf of the government, and seated to my right

8    are FBI Special Agent Jason Richards and FBI TFA Corporal Brian

9    Brouton.

10            THE COURT:  What is a TSA?

11            MS. LINEBERGER:  TFA, Task Force Agent.

12            THE COURT:  Okay.  Thank you.  All right.  Good

13    morning.

14            MS. BIRCH:  Good morning, Your Honor.  Panayotta Birch

15    on behalf of Jeffrey Mobley, and he's present before the court.

16            THE COURT:  Good morning.  All right.

17            Can I get an appearance from probation.

18            THE PROBATION OFFICER:  Good morning, Your Honor.

19    Michael Santucci from the US Probation Office.

20            THE COURT:  Good morning, Mr. Santucci.

21            All right.  We're here on the sentencing on Mr. Mobley.

22    I've reviewed the order adopting Chief Magistrate Judge Lynch's

23    report and recommendation on a guilty plea and I'd like the

24    record to reflect, if it is true, that that was done at the

25    convenience of the parties because no District Court Judge was
```

3

1      in the area at the time.

2              Is that correct, Ms. Lineberger?

3              MS. LINEBERGER:  Yes, it is, Your Honor.

4              THE COURT:  Ms. Birch.

5              MS. BIRCH:  Yes, Your Honor.

6              THE COURT:  Okay.  I've also reviewed the stipulation

7      of facts and acknowledgement of offense elements to support the

8      guilty plea.  The presentence investigation.  Note there has

9      been an adjustment for acceptance of responsibility.  Note that

10     no objections were reported by the government.  The defendant's

11     objections to the presentence investigation, the government's

12     response in opposition to the defendant's objections.  The

13     defendant's request for downward variance.  The defendant's

14     neuropsychological evaluation.  The notice of filing letters,

15     I've reviewed all the letters.  The notice of filing impact

16     statements, and I've reviewed those.  The preliminary order of

17     forfeiture and I reviewed the document filed by Ms. Lineberger I

18     guess yesterday, responding -- in opposition to the request for

19     a downward variance.

20             And I believe that I'm ready to proceed at this time.

21     I'll be happy to hear from both sides.

22             Ms. Birch, do you want to go first?

23             MS. BIRCH:  Yes, Your Honor.  Would you like me to deal

24     with the objections to the PSI first?

25             THE COURT:  Whatever you want to deal with first.

1              MS. BIRCH:  Okay.  Well, I'll start with the

2    objections.

3              THE COURT:  All right.  Tell me about your objections.

4              MS. BIRCH:  Yes, Your Honor.

5         Regarding the two level enhancement that Mr. Mobley

6    received, due to the fact that the probation officer states that

7    L.U. who is the minor, I'll refer to her as L.U., was in the

8    custody, care, and supervisory control of Mr. Mobley, I would

9    state to the court that I believe that they're using the fact

10   that he was the youth pastor at the church where he met L.U. in

11   a youth group, I would state to the court that the facts in the

12   indictment and the facts that Mr. Mobley pled to, none of which

13   showed that Mr. Mobley was in a situation where, one, he was on

14   some kind of a church trip or it was some kind of a church

15   activity or any of those things.  All the facts that are in the

16   indictment for all the counts all have conduct from the year

17   2015, I believe starting in January.  And again, I would state

18   to the court that Mr. Mobley was not in control or had any type

19   of supervisory control over L.U. in this case.  And for those

20   reasons, we're asking the court to sustain the two level

21   objection.

22             THE COURT:  All right.  Ms. Lineberger, would you

23   respond please?

24             MS. LINEBERGER:  Your Honor, when the defendant first

25   came into contact with the victim and began their relationship,

1  he was employed and being paid as a youth pastor.  His

2  responsibility to her began in between and 2013 and did not

3  stop.

4           Your Honor, although the counts in the indictment

5  involve and must involve specific dates, it's a continuing

6  course of conduct that was started when he was a youth pastor

7  and then continued on up until his arrest.  So I would argue,

8  Your Honor, he's much --

9           THE COURT:  I'll overrule your objection to the

10 paragraphs that recommend a two level enhancement.  I believe

11 that his position was -- put him in custodial supervisory

12 position as to the minor child.  I'll overrule your objection.

13          MS. BIRCH:  May I make just one more point for the

14 record, Your Honor?

15          THE COURT:  Sure.

16          MS. BIRCH:  There is a case out of the Eleventh

17 Circuit, United States versus McBurnette, M C B U R N E T T E,

18 382 Federal Appendix 813, it's a case out of the Eleventh

19 Circuit in 2010.  In that case, the court ruled -- the Eleventh

20 Circuit ruled that the defendant had care, conduct and

21 supervisory control over the victim in that case.  This was a

22 case where the defendant was instructing the victim not to tell

23 anyone about the sexual abuse and not to bring certain items

24 into the home.  And in that case, the Eleventh Circuit ruled

25 that the defendant had temporary supervisory control.

1    And I bring that to the court's attention to show a

2    distinction of what we have here.

3    THE COURT:  Tell me how that helps you.

4    MS. BIRCH:  Well again, in the statements there's a

5    statement that L.U. gave to law enforcement that was recorded

6    and in that statement, L.U. tells law enforcement that

7    Mr. Mobley never told me not to tell anyone, he never did that.

8    He said if this ever comes out, you know, tell the truth.

9    That's why I bring that case to the court's attention.

10    And I also have another case from the Eleventh Circuit

11    which is United States versus Sarras, S A R R A S, 575 F.3d

12    1191, 2009.  And in that case, the court found that the

13    defendant did have supervisory control over the victim.  In that

14    case, the victim was a seven-year-old child and the defendant

15    was married to the mother in that case.  And even after the

16    mother and the defendant divorced -- excuse me, and the

17    defendant moved into his own home, he also had a room in that

18    house where the stepchild would come over and spend time.  And

19    in that case, the court found that the defendant had supervisory

20    control over the defendant.  I'm sorry, over the victim.

21    So I bring those two cases to the court's attention to

22    distinguish from the facts that we have here.  Yes, Mr. Mobley

23    and L.U. met when he was employed as a youth pastor at The Grace

24    Place church, but my point to the court is none of the acts and

25    all the sexual activity that occurred happened while they were

1    in a church activity or in some kind of a field trip with the
2    church where in that scenario, Mr. Mobley, you know, would be
3    responsible and supervising the youth group.  And just for the
4    record, I just wanted that to be clear.
5            THE COURT:  All right.  Thank you for bringing those
6    cases to my attention.  But since they're not published and not
7    precedent, I wouldn't have to really pay attention to them, but
8    I do believe that they are distinguishable easily.
9            All right.  Next?  You have another objection based on
10   the grouping.
11           MS. BIRCH:  Yes, Your Honor.
12           THE COURT:  Does seem to me that you can group these.
13   Doesn't seem to me that that even -- you can argue it, but I
14   don't see it as a real issue.  Tell me why it is.
15           MS. BIRCH:  Why they should be grouped?  Is that what
16   the court is asking me?
17           THE COURT:  It seems to me that they are grouped
18   properly.
19           MS. BIRCH:  Okay.  I understand.  Again, I am objecting
20   to that.  I know that the probation officer, in the addendum,
21   referred to -- under 3D1.2 commentary note number four, there's
22   an example in there where it states that the defendant is
23   convicted of two counts of rape for raping the same person on
24   different days and the counts are not to be grouped together.
25           Again, I would distinguish that from the case we have

```
 1    before the court where this was not a case that involved rape,

 2    and I'm in no way mitigating any of the facts of this case.  But

 3    this was a case where there was sexual -- consensual sexual

 4    encounters.

 5             I would also bring to the court's attention that all

 6    the counts involve the same victim which is L.U.

 7             I would also bring to the court's attention that it is

 8    our position that it's a continuous act and that they should be

 9    grouped together because it involved the same victim.

10             THE COURT:  Aren't there cases from the Eleventh

11    Circuit that even say that production of child pornography on a

12    separate occasion is separate -- for different dates or

13    different dates would be separate charges?  I mean, isn't it

14    clear that the Eleventh Circuit has said that that's okay?

15             MS. BIRCH:  The cases that I saw from the Eleventh

16    Circuit involved different victims.  I could not find a case

17    that involved the same victim.  The ones that I read involved

18    different victims on different days, which is distinguishable

19    from what you have before you.  Which is yes, we have different

20    days, but we have one victim.

21             THE COURT:  Well, let me hear from Ms. Lineberger on

22    that.  I thought that the language in the Eleventh Circuit

23    certainly implied that every instance that child pornography is

24    produced is a separate offense.  Isn't there one that even says

25    that the same video can be a separate offense if it's in their
```

1    possession twice.  I mean, it just seems to me like -- well, go

2    ahead.  You tell me.  You're the one that has to defend it on

3    appeal, not me.

4              MS. LINEBERGER:  Yes, Your Honor.  I do not have an

5    exact Eleventh Circuit case that is directly on point at this

6    time.  However, Your Honor, the defendant, as far as the state

7    of Florida is concerned, would have committed lewd and

8    lascivious battery on any date that he had sexual contact with

9    that victim.  In other states, that charge is called statutory

10   rape.

11             So Your Honor, on the dates, on each date that he had

12   sex with that victim, or requested or had the victim produce her

13   own child pornography, is a separate instance, it's a separate

14   date, it's a separate offense and it shall not be grouped under

15   the guidelines 3D1.2 as well as in the comment note four, as

16   well as 3D1.22(d).  Your Honor, they're separate offenses each

17   and every time.

18             THE COURT:  I believe that the nongrouping is

19   appropriate and within the law.  I will deny your motion or

20   overrule your objection, whichever it is.  Okay?

21             Are we ready to proceed into the next level which I

22   guess is the defense request for a downward variance.  Downward

23   from 1,920 months, to where?  What do you think?  I mean, I

24   don't have a problem. 1,920 months is ridiculous.  Nobody lives

25   that long.  But that's not the point.  The point is what do you

1    propose to me is a fair and reasonable sentence for a crime that

2    is very, very despicable?

3           MS. BIRCH:  Yes, Your Honor.  Would you like for me to

4    go into my argument now?

5           THE COURT:  Go for it.

6           MS. BIRCH:  Okay.  In looking at the 3553 factors,

7    starting with the history and characteristics of Mr. Mobley --

8    well first, I would like to point out that his family is here

9    from Ohio.

10          THE COURT:  Yes, I see.  Thank you.

11          MS. BIRCH:  His parents, as well as his stepmother and

12   his stepfather.

13          I would point out to the court that he has -- he does

14   have family support.  He has no criminal history, as stated in

15   the Presentence Investigation Report.

16          Next, I want to go into some of the history that was

17   stated in the Presentence Investigation Report, as well as the

18   report that I submitted to the court from Dr. Olander who is a

19   psychologist. Right around -- and again, you know, this is going

20   to be an uncomfortable situation, but I have to state all of

21   these facts on the record.

22          THE COURT:  Go ahead.

23          MS. BIRCH:  Starting around the age of five, Mr. Mobley

24   was exposed to inappropriate sexual behavior, and all of this is

25   in the PSI as well as the doctor's report.  He was encouraged by

1   adults to be involved in inappropriate touching, oral sex

2   involving other children and other adults.  And this went on

3   from the time he was five, again when he was around the age of

4   ten and then when he was 17.  And actually this is documented by

5   the Findlay Police Department, which is in Ohio.  There was a

6   complaint and an incident report that was filled out due to the

7   fact that Mr. Mobley had sex with an adult female.  He was a

8   teenager at the time, he was a minor.  There were never any

9   charges brought forward regarding that case, but there is a

10  documented Findlay Police Department incident number 1-09-004684

11  and I do have copies of those reports.

12          And again, I bring all this to the court's attention

13  because I think it's important for the court to be aware and

14  know all of the history and characteristics of Mr. Mobley.

15          He never received any type of professional treatment or

16  never went to any type of counseling.  It's just something that

17  was shielded away his whole -- not only childhood, but as well

18  as his adulthood.

19          After graduating from high school, he went to college.

20  He was working.  He did receive his bachelor's degree and after

21  he graduated from college, that's when he moved down to Florida

22  due to the fact that he got a job at The Grace Place church in

23  Stuart, Florida.

24          Prior to that, in his childhood, while his mother was

25  married to her ex-husband, the ex-husband subjected not only his

1   mother, but him as well as his other siblings, to a lot of abuse

2   in the home.  There was even an incident where Mr. Mobley had to

3   interfere, as a child, between his mother and her husband at

4   that time.  And again, I do have the records from Findlay, Ohio

5   regarding that domestic battery.  And it was after that that

6   Mr. Mobley left his mother's home and he went to go live with

7   his father.

8          Stayed there for a little while and then when he came

9   back, as he described it to me, went back to his mother's house,

10  he was still very upset and very angry at the whole situation

11  that not only happened with his mother and the ex-husband, but

12  also with everything else that happened earlier on in his

13  childhood that was never dealt with.  And that's when he became

14  involved in the relationship with the youth pastor's wife, who

15  was an adult at the time.

16         THE COURT:  That's the same thing you just talked about

17  a few minutes ago.

18         MS. BIRCH:  Yes, Judge.  Yes.

19         THE COURT:  Okay.  All right.

20         MS. BIRCH:  Also while he was in college, he was

21  working, he did some volunteer work with an organization where I

22  believe five years in a row he traveled to Haiti where he did

23  some mission work there.  Also after that is when he moved down

24  to Stuart.

25         After some time, he moved to Ocala when he was married

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1    and that was in December of 2014.

2            In looking at the nature and circumstances of the

3    offense, I mean, obviously this is a very disturbing case, I'm

4    not going to minimize it.  I'm not going to make excuses.  When

5    you have an adult having sex with a 15-year-old, it's always

6    very disturbing and as a parent, I can understand why it's

7    disturbing.  But we're here today, Mr. Mobley has pled guilty,

8    he has admitted what he's done is wrong, not only to himself,

9    but to his family members and his loved ones.

10           As you read the numerous letters that you received from

11   people who knew him from work, from college and his family and

12   people who worked with him on the mission, everyone consistently

13   said they're shocked at this whole situation, they don't excuse

14   his behavior, but they just want the court to be able to see

15   Mr. Mobley in a different light, aside from being before the

16   court for having sex with a 15-year-old.

17           As I stated earlier, in the statement that L.U. gave to

18   the Martin County Sheriff's Office, she repeatedly told law

19   enforcement that Mr. Mobley told her not to lie and if the

20   situation ever came out, don't lie.

21           And regarding the facts, you know, he filmed the two of

22   them having sex.  They took pictures of each other, they took

23   pictures of themselves and sent them to each other.  I would

24   point out to the court that Mr. Mobley never downloaded any of

25   these pictures in any type of child pornography website or he

1       never --

2               THE COURT:  I think that's uploaded.

3               MS. BIRCH:  Uploaded, I'm sorry.  Thank you.  He never

4       uploaded any of those pictures or videos on any type of website.

5       He didn't go online and trade videos with other people, you

6       know, looking at child pornography.  He was sending the videos

7       to himself as well as videos and the pictures to some kind of a

8       joint e-mail account that he had with the victim, as well as his

9       own personal accounts that he had through Twitter and other

10      e-mail addresses.

11              And again, I bring that to the court's attention

12      because I think it's important for the court to know that he was

13      not uploading, like the court corrected me, and trading child

14      pornography with other people.

15              Even when I went to the discovery conference and Agent

16      Brouton went through the discovery with me, there are a lot of

17      pictures.  There are a lot of nude pictures, there are videos of

18      them having sex, but there were also a lot of other pictures.

19      Pictures meaning, you know, day at the mall, day at Chipotle,

20      silly days where, you know, they're not inappropriate pictures.

21              And the letter that L.U. submitted to the court --

22              THE COURT:  Well, they might not be inappropriate

23      pictures if he wasn't an adult and she wasn't a child.

24              MS. BIRCH:  Correct.  I understand that.  And again, as

25      I stated before, I am in no way excusing any of this behavior,

1   but I think it's important for the court to know the full

2   picture.

3          And in the letter that L.U. submitted to the court, she

4   states that yes, they had sex; they were, you know, involved in

5   this relationship, however strange that may sound.  But at the

6   same time, they also did spend a lot of time together where

7   there was no inappropriate sexual behavior going on.

8          Yes, he's the adult and she is a child, it should not

9   have happened.  But again, I bring that to the court's

10  attention.

11         The sentence must reflect the seriousness of the

12  offense, promote respect for the law and provide just

13  punishment.  The sentence has to afford adequate deterrence to

14  criminal conduct.  You know, Congress has set a minimum in this

15  case, the minimum is 15 years and the maximum is 30 years on the

16  first four counts, and the maximum is 20 years on the last two

17  counts.  I mean, there is a minimum in this case.  As the court

18  stated, the range is the 1,900 months or whatever.

19         THE COURT:  1,920.

20         MS. BIRCH:  1,920.  I would submit to the court that is

21  too long, too lengthy for several reasons.  Yes, that's what the

22  guidelines -- you know, you add up all these numbers and this is

23  where you fall.  But as the court is aware in the Booker case,

24  the court has the authority to vary in this case to an

25  appropriate sentence.

1              Yes, he needs to be punished.  Yes, he needs to spend a

2     lengthy prison sentence.  But Mr. Mobley does not need to be in

3     prison for the rest of his life.  For one, he pled guilty, he

4     accepted responsibility.  He realizes that he has a problem and

5     the problem cannot go untreated or ignored, it needs to be dealt

6     with.  And after he's done serving that prison sentence,

7     Mr. Mobley needs to receive intensive counseling.  And if he

8     goes to jail even for 30 years, he gets out, there's still a

9     problem that has not been addressed that needs to be addressed.

10             And again, I think the first step in accepting

11    responsibility is not only acknowledging what you did was wrong,

12    but also acknowledging to your family, your loved ones what you

13    did.  I mean, even in the letters that Ms. Lineberger filed from

14    L.U. and her mother, it's obvious that, you know, they're

15    God-fearing people and they talk about yes, he needs to be

16    punished, but L.U., I believe, uses the words "also show mercy",

17    which I'm not -- she never states an exact number of what she

18    wants, but again, I would state to the court 1,920 months is too

19    much time.

20             The need to avoid unwarranted sentence disparities

21    among defendants with similar conduct.  I stated, I believe, two

22    cases in my motion, and I know Ms. Lineberger stated several

23    cases in her motion.  The only additional case that I would

24    state, I'm not going to restate everything, is United States

25    versus Nagel, that was before Your Honor.  I believe maybe about

1    a year ago or maybe a year and a half ago.  And this was a case

2    where Mr. Nagel was having sex with underage girls.  In that

3    case, which is different from the case before you, Mr. Nagel had

4    created a fake Facebook page with like a different name and a

5    different identity.  And he was online, you know, looking for

6    teenage, middle school girls, the same type, the victims were

7    similar in age as to L.U. in this case.  And he was online, you

8    know, looking for teenaged girls.  But in that case, not only

9    did he misrepresent his identity, he also misrepresented his

10   age.  In that case, I believe Mr. Nagel had three counts, if I

11   remember correctly, and Your Honor sentenced him to 292 months.

12            THE COURT:  About 25 years, or 240 plus 52, about 23

13   years, correct?

14            MS. BIRCH:  My math is not that good, but yes.

15            THE COURT:  Somewhere in there.

16            MS. BIRCH:  Yes.

17            THE COURT:  More than 20, less than 30.

18            MS. BIRCH:  Correct.  Less than 25 even, if my math is

19   correct.

20            THE COURT:  But big difference.  He wasn't this

21   person's youth minister in a church where you go to for guidance

22   and leadership.  Big difference.

23            I understand.  Go ahead.  I see a big difference

24   between that case and this case.  And it wasn't in the context

25   of meeting her in a church atmosphere, it was in the context of

1    he's on the internet, she's on the internet.  What is she doing

2    on the internet?  I don't know.  I don't care.  It's not my

3    child.

4         But the bottom line is that's a very different

5    circumstance and he still got more than 20 years.

6         MS. BIRCH:  Yes, Your Honor.  But again, I'm in no way

7    excusing this.  He was a youth pastor like you said, the youth

8    in the church look for guidance and leadership.

9         THE COURT:  But tell me what you think.  I understand,

10   but tell me what you think.  I know you don't get paid by the

11   hour because you're devoted to this full-time.  But tell me what

12   you think is a fair sentence in this case.  You know, I'm

13   familiar with those cases.  Some of them are mine.

14        MS. BIRCH:  Yes, some of them are yours.

15        THE COURT:  And some of them aren't.  I saw where Judge

16   Moreno put somebody in for 100 years?  How long was it? 100

17   years?  Or 100 months?  100 years I think.

18        MS. BIRCH:  I think it was years.

19        THE COURT:  Yeah, that is a long time.

20        MS. BIRCH:  That is a long time.

21        THE COURT:  Unless we're sentencing elephants, that

22   isn't happening.

23        MS. BIRCH:  Again, Your Honor, an appropriate sentence

24   in this case is a sentence as close to the minimum mandatory

25   possible, I would submit to the court is an appropriate sentence

1  in this case.  He's very young --

2      THE COURT:  He is young, but --

3      MS. BIRCH:  He is very young.

4      THE COURT:  But she is even younger.  And despite her

5  saying have mercy on him, she also said that this will affect

6  her the rest of her life.

7      MS. BIRCH:  Most definitely it will affect her, it will

8  affect her parents, it's going to affect the family for the rest

9  of their life.  Yes, it will.

10      THE COURT:  And God forbid she should do something in

11  the future, her lawyer will be standing up and saying you have

12  to remember that when she was 15 or 16 or 17 years old, she was

13  molested by an adult.  And then some psychologist is going to be

14  telling that judge -- I hope it doesn't happen.  I hope she has

15  a complete turn-around and is fine.  But that's just awful.

16      MS. BIRCH:  Yes, Your Honor.  But also I do believe he

17  needs to be separated from the category that he did plead guilty

18  and he did accept responsibility.  So for example, had he went

19  to trial, this 1,900 months or -- I guess it would have been

20  higher because he wouldn't receive the three levels.

21      But the point that I'm trying to make to the court is

22  yes, he needs to be punished, but he also needs to receive

23  treatment.

24      THE COURT:  Okay.  Look.  There's no question that the

25  penalties for child sexual abuse and child pornography are

1    draconian.  I'm not arguing that.  Congress has done it for

2    whatever reason.  Looks good.  Looks wonderful to say child

3    molesters are going to get 24,000 months, as if we had prisons

4    with large refrigerators in them.  I mean, no.  That's not going

5    to happen.

6          But the bottom line is what are you telling me that you

7    think?  15 years is not happening, Ms. Birch.

8          MS. BIRCH:  20, Your Honor?  I would submit to the

9    court 20 years is appropriate.

10         THE COURT:  I'm not sure.  I'm not sure that he doesn't

11   need more than that.  But I hear you.

12         MS. BIRCH:  I would definitely submit to the court, you

13   know, a sentence of around 20 years is sufficient and not

14   greater than necessary in this case.

15         THE COURT:  I want to give him a sentence that reflects

16   the seriousness of this offense, and also gives him a reason to

17   behave in jail.  Because I got to tell you, I don't know if I

18   want to be a jailer, but I want to have people in there that

19   think like they have to have a reason to behave.  Because if

20   they behave, some day they'll get out.  And he's what, 24 years

21   old?

22         MS. BIRCH:  Yes, sir.

23         THE COURT:  All right.  I hear you.

24         MS. BIRCH:  That will take him to his 40s.

25         THE COURT:  I'm happy to continue listening to you.

1          MS. BIRCH:  Thank you, Your Honor.

2          THE COURT:  Also a pleasure listening to you.

3          MS. BIRCH:  Thank you, Judge.  Again, you know, the

4    facts, as the court has stated there, they are very disturbing

5    and it's a very delicate situation.  And as the court stated,

6    L.U. is going to be affected by this for the rest of her life.

7          But again, an appropriate sentence in this case in my

8    opinion, Your Honor -- and I would submit to the court is not,

9    you know, 1,900 months or even 30 years, I would submit to the

10   court.  You know, 30 years would put him at, you know, 50 years

11   old when he gets out.

12         Again, to distinguish his behavior from other cases

13   that were stated in both the government's and my pleadings, it

14   was inappropriate, it should not have happened.  But I have to

15   state this for the record, he didn't rape her, as -- and I am in

16   no way trying to minimize or in no way trying to justify

17   anything.

18         THE COURT:  But he did rape her because she's too young

19   to give consent.

20         MS. BIRCH:  She's too young to give consent, Judge.

21   But this was not a situation where -- and I don't want to get

22   into all these details, but this was a situation where it was a

23   consensual situation.  Now, is it wrong?  Yes, it's wrong

24   because an adult should not be having sex with a 15-year-old.

25   There are no ifs, ands, or buts about that.  But I bring that to

1    the court's attention --

2         THE COURT:  An adult that is being paid to be in a

3    supervisory situation with a child.

4         MS. BIRCH:  Yes, sir.  He was a youth pastor.  But

5    again, I would stand by my position earlier that he was not on a

6    trip with the church at the time, it was not a church activity

7    where this occurred.

8         THE COURT:  That would have been worse.

9         MS. BIRCH:  Yes, it would have been worse and that's

10   the point that I'm trying to make.  This was on their own free

11   time.  I don't know if that makes any sense, but it was not

12   during church related activities.  It was just the two of them

13   together and it had nothing to do with a church activity. It was

14   on their own time.

15         Again, yes, he made the videos.  He did not, you know,

16   trade them with other people online or upload them to the

17   internet so that other people -- and again, that would have been

18   a lot worse had that happened in this case.  He sent the videos

19   to himself as well as the pictures and to L.U. in the case.

20         And I know also there was this calculator app, and I

21   don't know if I'm going to explain it properly, but it's an app

22   on a phone that looks like it's a calculator when you look at

23   the phone.  But if you put in a code, then it has like hidden

24   pictures.  And that's where Agent Brouton also found other

25   videos and pictures.  And I know -- I'm sure Ms. Lineberger is

1  going to talk about that, and he was trying to hide it.  Well

2  again, I'm not minimizing it because he knew what he was doing

3  was not right.  He should not have been involved in any type of

4  relationship or having sex with a 15 year old or any child under

5  18.

6          THE COURT:  What about the other victim that came after

7  the fact?  What about that?  I mean, that's very troubling.

8          MS. BIRCH:  Ms. Lineberger sent me a copy of that

9  letter.  And it's a letter where there's a lot of talk about

10  testimony and, you know, previous testimonies that were given at

11  the church.  And yes, Mr. Mobley sending a letter to a friend to

12  give to the 15-year-old was stupid.  I mean, I don't know how

13  else to say it.  I know that law enforcement is investigating, I

14  guess, from what I'm being told.  The letter talks about

15  testimonies and the church.  And I will say that in the same

16  letter, he does admit his wrongdoing in that letter.

17          So again, here is someone -- and he should never have

18  sent the letter.  I mean, again --

19          THE COURT:  He didn't get advice of counsel.

20          MS. BIRCH:  Well, actually I won't address that point,

21  Judge.

22          THE COURT:  Okay.

23          MS. BIRCH:  He should have never sent the letter.  I

24  don't know how else to say it.  Yes, it's disturbing.

25          THE COURT:  It's very disturbing.

1          MS. BIRCH:  And I can understand from the court's

2    perspective, but I'm just letting the court know what was in the

3    letter.  And he admits his wrongdoings in the letter.  So it was

4    a lot of talk about testimony.

5          So again, I don't want to keep repeating myself, I want

6    to stand by my pleading and all the arguments that I've made in

7    my pleadings as well as the arguments I've made in court this

8    morning.  But in looking at all the 3,553 factors, I'm asking

9    the court to impose a sentence that is sufficient and not

10   greater than necessary.  And I know we've talked around some

11   numbers this morning and I would ask for a sentence of 20 years.

12         THE COURT:  You've certainly gotten me down from 1920

13   months.  All right.

14         MS. BIRCH:  Well, I'm glad to hear that I've talked you

15   down.

16         THE COURT:  I know Ms. Lineberger is not going to be

17   happy, but I'm not sending him to jail for what is that, how

18   much is 1920 months?

19         MS. LINEBERGER:  160.

20         THE COURT:  220 years or something like that?

21         MS. LINEBERGER:  About 160, Your Honor.

22         THE COURT:  160 years.  Okay.

23         MS. BIRCH:  Which is life.  I mean, we can't call it

24   life because the statute doesn't call for life.  But that is a

25   life sentence, Your Honor.  And a life sentence is not -- I know

```
 1        the court cannot impose life, but I would also point out to the

 2        court even a sentence of 30 years or 35 or 40 would equate to a

 3        life sentence just based on his current age and is not necessary

 4        in this case.

 5                THE COURT:  That's not true.

 6                MS. BIRCH:  Well, if he gets 40 years he'll be 60 plus

 7        when he gets out.  That's pretty much your whole life.

 8                THE COURT:  Well thank you very much.  I've been dead

 9        for ten years?  I didn't know that.

10                MS. BIRCH:  No, sir.  I am not implying that.  What I'm

11        trying to imply to the court is that he's 24 years old right

12        now.  Yes, he needs to be punished.  I do not disagree with the

13        court on that statement.  He needs to be punished.  And the

14        punishment needs to be sufficient and not greater than

15        necessary, and I would ask the court to consider a sentence of

16        20 years in this case.

17                THE COURT:  All right.  Thank you, ma'am.

18                Ms. Lineberger?

19                MS. BIRCH:  Oh, I'm sorry.

20                THE COURT:  I'll be happy to hear from other people.  I

21        just want to get her views on what you've said then I will call

22        on you again.

23                Ms. Lineberger?

24                MS. LINEBERGER:  Your Honor, the government has set

25        forth its position on the defendant's request for a downward
```

1    variance.

2          THE COURT:  You do not believe a downward variance is

3    appropriate at all, correct?

4          MS. LINEBERGER:  Correct.  However --

5          THE COURT:  Notwithstanding the fact that physically it

6    is impossible for him to do 100 plus years.

7          MS. LINEBERGER:  Well Your Honor, what I would say to

8    that was we could tell him to the best he can on that.

9          THE COURT:  All right.

10         MS. LINEBERGER:  But Your Honor, in all seriousness

11   here, this case is not a peer to peer case, it is not the

12   run-of-the-mill strict child pornography on the internet case.

13   This is a case about victimization, it's about abuse of power,

14   it's about numerous levels of breach of trust.

15         The defendant met the victim, both of the victims in

16   this case, Your Honor, and the Presentence Report does talk

17   about his other victim at Grace Place.  That individual, whose

18   initials were K.M., she was a victim first, Your Honor.  They

19   both met him in the same exact role when he came to Stuart,

20   Florida under the guise of being a youth pastor.  A sheppard of

21   that flock of Grace Place.

22         He was given control of their minds and their morals by

23   not only the church, not only the congregations, not only the

24   pastor, but their parents and the victim's themselves.  That's a

25   lot of power.  It's a lot of power in the hands of a professor,

1    it's a lot of power in the hands of a teacher, a scout master, a

2    baby-sitter, a parent, a paramour, a stepparent, and he took

3    that power and abused it.  Not once, but twice that we know of.

4             And now we know, since he's been sitting in jail on

5    Rock Road, he has the nerve and audacity, when he's facing life

6    in prison, to write and sneak a letter to an adult, mail it to

7    an adult so they can hand it off to a 15-year-old teenager in

8    that same youth group.  How does that speak to his likelihood of

9    recidivism?  Which is glaringly absent from the report from

10   Psychological Affiliates and Dr. Olander.  Glaringly missing.

11   Your Honor, this report isn't worth the paper it's written on.

12   First of all, he's undiagnosed until he's 25.  Second of all,

13   he's diagnosed after he's facing life imprisonment.  He's not

14   given the sex reoffender tests that we know are reliable and

15   have been used time and time again after this by this court.

16            So what does he do to both girls?  And I'm going to try

17   to compress it and if the court needs me to, I would be able to

18   call Corporal Brouton to set the facts into the record.  He

19   meets them both in the youth group.  K.M. is slightly older than

20   L.U., but the same pattern happens.  He has them, they're a

21   trapped audience, they're in the youth group.  Their parents

22   have put them there to get moral guidance from him.

23            What does he do?  He befriends them, he lowers their

24   inhibitions, he starts off in the group, then he starts

25   isolating them.  He takes them away from the group and he has

1  them under his power.  Each of them separately.  This is going

2  on at the same time, Judge.  He's playing both of these teenage

3  girls.  They don't even know it.

4      He starts taking them out, he starts buying them

5  things, then he starts giving them alcohol.  Violating the law,

6  supplying alcohol to minors.  Reducing their inhibitions.

7  Buying them things.  Showing them that one-on-one attention.

8  Over and over again, and their inhibitions and their morals are

9  being lowered and lowered and lowered and lowered.

10     He loves them.  They're beautiful.  They're sexy.

11 They're his Victoria's Secret models.  What girl, any woman

12 wouldn't want to hear that from a man?  And this is the youth

13 pastor showing them this attention.  He's 25, 24, with a college

14 degree.  The youth pastor of the church is showing these teenage

15 girls such attention.  He telling them each he loves them.

16     Meanwhile, he's telling his fiancé he loves her.

17 Telling his wife he loves her.  Let's talk about some betrayal

18 here, not only is he betraying the church, the families, the

19 teenaged girls, the fiancé who he knows is a state prosecutor in

20 Gainesville.  Talk about the damage that he has done, not only

21 to the 15-year-old, but to that young prosecutor.  Her first

22 job.  A prosecutor.  And she has to leave her job because her

23 husband is a child molester who puts it up and films it.  This

24 young woman he married and continued to dabble and have sex and

25 rendezvous and meet with L.U. in trucks.  In his house in Stuart

1    that he is supposed to be rehabbing.  And six occasions in
2    motels.  Sleazy Stuart, Florida motels that he takes this girl
3    to and films it.  Time after time after time.  By L.U.'s
4    estimate, they were having sexual relations from January 2014 up
5    and through September 2015.  He got married in December 2014 and
6    he's having unprotected sex with these girls.  Between March
7    2015 and September 2015, six hotel visits.  So he's taking them
8    off campus, taking them out without permission, brainwashing
9    these girls.
10        Then the deception starts, because we know he's lying
11   to his wife.  Well then, he creates different Twitter accounts
12   in different names to hide the tweets back and forth.  All night
13   long, all hours of the night.  When this child should be getting
14   sleep or studying or just being a regular 15-year-old, he's
15   tweeting her asking her for pictures all night long.  No wonder
16   the girl's grades dropped.  Her self-image changed.  She no
17   longer had fun in groups of children, she couldn't relate to
18   15-year-old girls anymore because she's sleeping with this
19   25-year-old.  She couldn't relate to her friends.  She didn't
20   want to go to school.  The mother details through her letter
21   that has been supplied to the court and the victim impact
22   statement, the girl talks about -- L.U. talks about her lowered
23   self esteem.  Her lowered morals.
24        No, he didn't hold a gun to her head, Your Honor.  He
25   affected her much deeper than that.  And she is still going

1    through counseling and will need counseling for a long time.

2            He's a charismatic manipulator, Your Honor, that

3    victimized at least two girls.  Two young girls.  He's done

4    damage to his victims.  The restitution continues.

5            The guidelines do take into account his acceptance of

6    responsibility.  Otherwise, they would be higher.  I don't know

7    how life can go higher, maybe double life, Your Honor.  But he's

8    gotten credit from that.

9            And isn't it interesting that the letters on his behalf

10   are from folks that used to know him.  Even L.U.'s mother said

11   she never thought this would happen.  L.U.'s mother is a

12   counselor of sexually abused children.  Think of the damage he's

13   done to her.  That "not my child" moment hit that woman as well.

14   And she has to see her child through this experience, as much as

15   she has had to see other people's children, and know that she

16   put her child in the hands of that 24-year-old monster.  The

17   two-faced monster.  Because it shows the court he is capable of

18   fooling everybody.  Everybody he knew in his hometown and now

19   the people that entrusted him in Stuart, Florida.

20           Of course, the child believes he should receive Your

21   Honor's grace and a tempered sentence.

22           THE COURT:  Mercy is what she said.

23           MS. LINEBERGER:  And mercy, Your Honor.  She still

24   doesn't and isn't capable of fully realizing the harm that he's

25   done.  The abuse of trust.  His betrayal of everyone connected

1  to those children and the people that trusted him.  And that he

2  would still reach out to kids, a child, after being

3  incarcerated, doesn't that show, Your Honor, that he needs to be

4  incapacitated.  The world needs to be protected from him.

5        Yes, his report talks about him being bipolar.  Your

6  Honor, he is a sociopath, incapable of conforming his conduct to

7  the acceptable morals and societal requirements of his behavior.

8  And he is dangerous.

9        Your Honor had a defendant by the name of Gauthier, and

10  that man was approximately 55 years in age.  And Your Honor will

11  recall the damage that the defendant Gauthier did to his

12  stepdaughter and that was encouraging her to have sex with

13  another teenager, Your Honor.  This defendant was doing the sex

14  himself.  And you gave Gauthier a sentence of 30 years, which

15  would incapacitate him up until around his mid-80s.  Doesn't

16  this defendant require an even harsher sentence than that?  And

17  shouldn't this defendant be incapacitated until well into his

18  70s or 80s.  20 years would have him getting out at 44, 45.

19  That's a lot of time for somebody to continue to abuse, sexually

20  abuse children.  That's a whole lifetime ahead of him.  Your

21  Honor, he deserves to be incapacitated until he's in 80s as

22  well.

23        For all the 3553 factors.  Because the sexual abuse

24  that's reported after the fact is questionable. The sex with the

25  youth pastors wife wasn't a crime.  He was the age of consent.

1    His personal mitigating, if one would call it that,

2    characteristics, certainly do not outweigh all of the betrayal

3    and the abuse of trust and the use of deception and his

4    likelihood of recidivism that has been borne out in this case.

5         So Your Honor, because you cannot impose life, the

6    government is requesting a sentence to reflect the seriousness

7    of this case, and the government is asking that you sentence him

8    to no less than 40 years imprisonment.  Thank you.

9         THE COURT:  Thank you.  Ms. Birch?

10        MS. BIRCH:  Yes, Your Honor.  I do have some witnesses.

11        THE COURT:  All right.

12        MS. BIRCH:  First I have Jerry Mobley.

13        THE COURT:  Yes, sir.  Please tell us your name.

14        THE WITNESS:  Jerry Mobley.

15        THE COURT:  What would you like to tell me.

16        THE WITNESS:  I just -- I am Jeff's father, Jerry.  And

17   I just wrote a few words.  I know everybody's probably already

18   made their own opinions and everything, but as a parent you

19   would expect me to come and talk about all the good qualities

20   and all the good that he's done so far in his life.  But nothing

21   gives a parent more pleasure and comfort than hearing it from

22   strangers and people that he's come into contact and known in

23   the past.

24        I had a person, probably a month or so ago, that

25   inquired about Jeff that he bought a couple cars from.  He spoke

1    very highly of Jeff.  Making me feel a little, I don't know,

2    uncomfortable or flattered that, you know, his opinion was so

3    high.  At that point, I was able to see Jeff through other

4    people's eyes, which made me proud of him, not just for being my

5    son, but for who he is.

6            From an early age, Jeff had already tried to set a good

7    example for his siblings and peers, especially helping his

8    brother and sister with severe autism feel as typical and normal

9    as possible.  I never seen him roll his eyes or look like he was

10   embarrassed in public or in front of his friends.  He's always

11   been able to really connect with them and bring out the best in

12   them.  He's always been interested in helping others, whether it

13   be a desire to be a firefighter or helping people in Haiti

14   before and after the earthquake.  He has such a big heart.  I

15   wish you all had a chance to get to know him.

16           I do realize the seriousness of the case.  I understand

17   that every action has a consequence.  Please take into

18   consideration though the other side that you don't know yet.

19           THE COURT:  Thank you, sir.

20           MS. BIRCH:  Next, Your Honor, is Jennifer McDaniel.

21           THE COURT:  Yes, ma'am.  Please tell us your name.

22           THE WITNESS:  My name is Jennifer Thompson McDaniel.

23   I'm Jeffrey's mother.

24           THE COURT:  All right.  Please tell me what you like to

25   say.

1            THE WITNESS:  I think to make sure I stay on course, I

2     wrote a little spiel out.  But I think as we've gone through

3     everything, I'm going to touch on some of the highlights rather

4     than reading it in full.

5            I do want to take a few minutes to talk about my son.

6     When I was 15 years old, I became pregnant with Jeffrey.  I too

7     was very young and I had the choice in front of me whether to do

8     what a lot of girls were doing and have abortions, or give up my

9     child for adoption, or make a difference in this world and raise

10    my son, and I chose to raise my son.

11           He was a great baby from the beginning, and not that

12    that has any influence on this court today, but he was something

13    special from the very beginning.  It was very hard to finish

14    high school with a baby at 15, 16, 17, 18-years-old, but I did

15    it.

16           Some of the things I want to bring up on Jeff's behalf

17    is number one, that he always has had a heart to help people.

18           But the other significant thing I want to bring up

19    about Jeffrey is that I don't condone what he did in any way.

20    But I also know what my child has been through and there was a

21    lot of sexual abuse at a very young age in his life.  And a lot

22    of limitations that I had as his mother to get him the help that

23    he needed and to allow him and to encourage him to be able to go

24    along with the help.

25           There was a sentence brought up recently today about

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

1  victimization and breach of trust.  My son definitely had that

2  done to him.  The authorities, the communities, they did not

3  protect my son when he went through sexual abuse and from being

4  a sexually abused victim myself at a young age, by my father and

5  my household, I know that it causes you to make very bad

6  decisions in your life.  Again, not condoning what he did, but

7  it makes a big deal.  Makes a big difference rather.

8         A lot of the counseling that Jeffrey received at a

9  young age from the sexual and physical abuse that he encountered

10  was very sporadic and limited because of funds.  I did my best

11  to get him into church and to try to give him the best mental

12  help that he could have.

13         I'm very proud of the way he tried to overcome things

14  on his own.  I'm very proud of his college degree, I'm very

15  proud of his heart and I know that despite the choices that he's

16  made, I know he's a good young man.

17         My heart goes out to the girls that are involved in

18  this, because I watched my son go through that same thing.  And

19  I ask you as the judge today to consider the fact that he was

20  mistreated a lot as a child to be considered today.  Because

21  that does make a difference in the choices we make in the

22  future.

23         I ask, last but not least, from his mother's

24  standpoint, I ask you to consider the minimum sentence.

25         Thank you.

1          THE COURT:  Thank you, ma'am.

2          MS. BIRCH:  Lastly, Mr. Mobley would like to address

3     the court.

4          THE COURT:  All right.  Just stay seated, it's easier

5     to speak into the microphone.  Yes, sir.

6          THE DEFENDANT:  I have prepared a statement but a lot

7     of the things I was planning on saying have already been

8     addressed, so I'll not read through the whole thing.

9          I've been in jail for seven months and seven days and I

10     was arrested on October 5th.  When I was first arrested, I was

11     in shock of everything that was going on, but I knew why I was

12     being arrested.

13          For the past seven months, I've had a lot of time to

14     think and reflect on my life and what had gotten my here, and I

15     can say with 100% certainty the person that came into jail seven

16     months ago is not the same person that is standing here today

17     and that is because I've taken the steps to look inward at

18     myself, at the things that I had been trying to avoid for my

19     entire life.  Until this time, I never said anything about any

20     of the events that happened in my life from when I was a child

21     with the baby-sitter and her father.  They had a daughter who

22     encouraged sexual behaviors between both of us and were telling

23     us specific things to do, performing sexual behaviors on each

24     other.  And at the same time, my brother was molested by another

25     person in that house and he had gone through some serious

1   psychological trauma with that.  I didn't understand what was

2   going on at the time, but from my understanding as a

3   five-year-old, it looked like he was getting in trouble for

4   something, and naturally I assumed it was the same thing that

5   the father had put me and his daughter through.  So I began to

6   hide those things and start just to bury those things down.

7          Later on in my middle school years when my mom got

8   remarried, similar sexual things happened with the children of

9   my stepfather, both male and female, and those occurred over the

10  course of a few years.  And by the time I decided to work up the

11  nerve to say anything about it, my stepfather's alcoholism was

12  extremely off the charts physically, emotionally.  I had been

13  punched, pushed, kicked, yelled at and just living in fear for a

14  long time.  I'd watched my mom get thrown down, hit and cry and

15  until finally he was choking her one night in the middle of the

16  night and I had to call the police.  I spent a lot of time in

17  fear of these things.

18         The incident that was brought up regarding my youth

19  pastor's wife, I was in the process of recovering from a surgery

20  and I was on heavy medication for the pain.  And was not in my

21  clear state of mind thinking.  If I would have been, I never

22  would have gone through something like that.  And immediately

23  after that event happened, I was filled with more guilt and

24  shame than I've ever felt in my life.

25         I tried to understand why things were going this way in

1    my life and what I've done wrong.  And I didn't realize that

2    burying all these things down, extremely devastating and

3    traumatic things, were causing so much damage to my personality

4    and to my psychological development through the most

5    developmental time in my life.  So I just wanted to get away, I

6    thought I had to get away from the people I knew, the

7    circumstances I'd grown up in and pursued college to try and

8    find a better way to live.  I felt like that was what people did

9    to get to a better place.  They went to school and they made

10   something of themselves and had a job and had a family.  Ever

11   since I was a kid growing up in a broken family, it's been

12   nothing more than a dream.  But as I got older, I had a desire

13   to have a family of my own, to have children that I could love

14   and to have a wife that I could be there with and not put them

15   through a divorce that I had to go through and have them

16   question whether they're loved or whether they're going to get

17   beat up when they come home.

18       And I found a lot of comfort through my high school

19   years and middle school years in my church with adults who were

20   there to care and who could see I was struggling through things.

21   I was just very angry and closed off because I didn't trust

22   anybody.  The people who were closest to me, I didn't feel like

23   I could trust so I didn't trust anyone.

24       And I moved here after I graduated to become a pastor

25   because my wife's from Florida.  I found a job here, and I

1    wanted to give that back.  I gave so much of my time to my youth

2    group as a student and it had helped me.  It gave me a way out

3    to be out of my house and away from the places I was afraid.

4    And I wanted to give that back.

5            And for the majority of the time I was there, there's

6    plenty of references to justify and to back up the fact that I

7    poured my heart into my job and to that.  It wasn't even a job

8    to me.  I loved being around people.  I love people.  I care

9    about people.  I will spend countless hours doing whatever for

10   complete stranger.  That's the kind of person I am.  And it's

11   not anything manipulative or trying to get something in return.

12   I love to help people.

13           And the pressure that was put on in my job led me to

14   being forced out of the position, not by my own terms but

15   because of circumstances I don't fully understand and was asked

16   to resign to avoid the drama of having a staff member fired from

17   a church.  No way in regard related to this.  And I was

18   devastated.  Everything I had gone to school for, I had barely

19   been at my job for 16 months and I was losing it.  I just bought

20   a house, lost it and I was not able to spend any time with my

21   fiancé and we were getting married in a few months.  And I felt

22   like everything that I had worked so hard to build around me to

23   get away from the life that I had been so ashamed of and running

24   away from was all crumbling.  And I let the overwhelming

25   feelings of that take over.  I let my guard down and I developed

1  a friendship with someone I shouldn't have ever crossed that

2  boundary with.

3         There is no way that I'm saying that any of this is

4  justifiable or that I'm blaming my actions on my job or any

5  other thing beyond that.  From the very beginning, from day one

6  being arrested, have been cooperative and been honest about

7  everything that happened.  I've taken full responsibility and I

8  stand here and take responsibility for everything that has

9  happened.  And I do not justify, I don't have any excuse, I

10  don't have any reason or way to down play it at all.  There's

11  nothing -- I'm not proud of it.  It's something that I'm going

12  to have to look back on and accept that those actions were my

13  actions and I have to live with those things.  But I'm not a

14  monster.  I'm not that person that's being portrayed to be a

15  monster.  I don't victimize people, I'm not searching for

16  people.

17         The letter that was brought up was brought my attention

18  by a parent of a person from my church saying that they had had

19  some problems.  It's a single mother going through problems with

20  their five kids potentially being taken away for child

21  protective services.  And the content of the letter, there's

22  nothing to be investigated because the content of the letter

23  simply states I understand what it's like to be one of five

24  children with a single mom and having struggles in life.  Keep

25  your hopes up, God's going to help you through this, don't give

1    up, stay strong.  That's the content.  I was not -- there was no

2    victim in any of these matters, that's -- it was simply

3    encouragement.  And I would not have gone and done something so

4    stupid to contact someone, ever in that way, ever again, let

5    alone right in the midst of my circumstances now.

6         Over the past seven months in this county jail, I have

7    spent the first couple months trying to wear off from the shock

8    and set in to my new life.  And from that, I had a choice to

9    either embrace the way of the jail, the way of -- you know, the

10   convict mentality and see what you can get away with and do

11   whatever you can to get by, or take the high road and do the

12   right thing, be honest and try and use this time what it's

13   designed for, to correct my behavior and to start focusing on

14   the things inward and to address those things.

15        I've been involved in Bible study, leading a Bible

16   study.  Helping people get adjusted as they come in as new, you

17   know, arrested people, who are afraid in the same way I was.

18        You mentioned earlier about a sentence to allow me to

19   behave well in prison.  It's not a matter of behavior.  I have

20   no problem behaving.  I had a moral failure and I had a period

21   of time over a few months where I had extremely poor judgment

22   because I let my emotions get the best of me and my anxiety and

23   fear of what the future was holding take control.  And I never

24   should have let my guard down.  I never should have gave into

25   those things.  I should have spoken up about it.  But my entire

1   life, any time I've spoken up about something I'm reprimanded or

2   punished or made fun of or manipulated for it.  Any time I would

3   speak up about something that would happen as a kid, my

4   stepfather would make fun of me or hit me or do something.  I've

5   grown up not trusting people around me.  I've not been able to

6   trust teachers.  Anyone in authority positions, it's been very

7   challenging for me to trust anyone.  So from that, I decided I

8   need to do the best on my own.  And unfortunately, it works for

9   a while but I still was very broken inside and eventually, it

10  led to my best being here.

11          But at the same time, that's not the person I am.  My

12  whole life isn't revolving around this.  This was a particular

13  instance where I failed.  I'm a human being, I am not a monster.

14  I have still the same desires as I've always had to contribute

15  something to this world, to this society, to someone, to

16  something, to a group, to have a family, to love my own family,

17  to build relationships with people and to learn from my

18  mistakes.  I've always learned from my mistakes.  I learn.

19  Every time I fall, I get back up.  Every time I fail, I find a

20  way around it.

21          And this is one of those things that has been the

22  biggest eye-opening, rock-bottom-hitting moment of my life.  But

23  I can guarantee with my whole heart and mind that this is never,

24  ever going to be an issue ever again. And there's no -- I'm not

25  a risk to anyone.  I'm not a risk to anyone in this room, I'm

1   not a risk to anyone on this planet.  I'm a human being who made

2   a mistake and I am deeply sorry for it.  I regret it with all my

3   heart.  If I could go back, I would take it back.  Not because I

4   got caught, but because what I did was wrong.

5          And I'm deeply sorry for the family that's involved in

6   this, that I hurt them.  I wish I can take that back.  I know

7   what it feels like to be hurt in a family and have things go

8   wrong and that are unfair that you can't control.

9          I apologize to everyone that's been affected in this

10  situation, and any hurt that I've caused, anyone including my

11  own family.  But I can say with 100% certainty, out of the

12  clearness of my mind, that has happened over the past seven

13  months, that I'm not the same person as when I was arrested.  I

14  have faced those things.  I've been honest about all the darkest

15  parts of my life, which is not fun to do.  I have no more

16  secrets.  I'm an open book to the entire world now.  I've been

17  all over the TV and newspaper.  I have nothing to hide anymore,

18  and I'm a better person sitting here today.  I'm not proud of

19  why I'm here, but this past seven months has changed my life in

20  the way that it's needed to be change for a very long time.

21          THE COURT:  Thank you, sir.

22          Ms. Birch, anything further?

23          MS. BIRCH:  No, Your Honor.

24          THE COURT:  All right.

25          (Discussion off the record).

**PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY**
**TRANSCRIPT PRODUCED BY COMPUTER**

1          THE COURT:  I'm ready to proceed.  Is there anything

2     further from the defense and/or the defendant?

3          MS. BIRCH:  No, Your Honor.

4          THE COURT:  Government?

5          MS. LINEBERGER:  Your Honor, just that with regard to

6     restitution, it is not yet final because it's continuing.  So

7     it's around 664 now, but she's still going through counseling so

8     we don't --

9          THE COURT:  Well, how long do we need to do that?

10    Because I can set it for 90 days.

11         MS. LINEBERGER:  I'd ask for that, Your Honor, and then

12    we could probably hopefully work something out between then and

13    I can speak with the --

14         THE COURT:  Well, where is he supposed to get this

15    money from?  You know, what do they pay them?  12 cents a day or

16    something for working?  That's not your concern.

17         MS. LINEBERGER:  Yes.

18         THE COURT:  Okay.

19         MS. LINEBERGER:  That's true.

20         THE COURT:  Okay.

21         MS. BIRCH:  Your Honor?

22         THE COURT:  Yes.

23         MS. BIRCH:  Regarding the restitution hearing, I would

24    ask that Mr. Mobley's presence be waived.  We've already

25    discussed it.

```
 1              THE COURT:  All right.  Mr. Mobley, do you agree that
 2    if there is a restitution hearing, that you do not need to be
 3    present so you don't have to stay at this county jail?
 4              THE DEFENDANT:  Yes, sir.
 5              THE COURT:  Okay.  Is any objection to that Ms.
 6    Lineberger?
 7              MS. LINEBERGER:  No, Your Honor.
 8              THE COURT:  Okay.  Then we'll set a restitution
 9    hearing.
10              All right.  Is there anything further from the
11    government or the defense?
12              MS. BIRCH:  No, Your Honor.
13              MS. LINEBERGER:  No, Your Honor.
14              THE COURT:  All right.  Let me just start out by saying
15    that it is my intention -- well, I've considered the statements
16    of all the parties, the Presentence Report which contains the
17    advisory guidelines and the statutory factors as set forth in 18
18    USC section 3553(a).
19              A sentence will be imposed below the advisory guideline
20    range based upon all of the circumstances of this case.
21              It is the finding of the court that the defendant is
22    not able to pay a fine or the additional special assessment;
23    however, I will order the assessment of $600 which is called
24    for.
25              Since restitution is not fixed, I will set a
```

1    restitution hearing for August 8, 2016, 2 p.m. here in this

2    courthouse in Fort Pierce.  The defendant need not be present at

3    that time.

4            It is the judgment of the court that the defendant,

5    Jeffrey Brian Mobley, is committed to the Bureau of Prisons to

6    be imprisoned for 540 months, which consists of 360 months as to

7    each of Counts 1 through 4, to be served concurrently and 180

8    months as to each of Counts 5 and 6, to be served concurrently

9    with each other and consecutively to Counts 1 through 4.  It is

10   my intention that he be given 45 years.  If my computations are

11   wrong, I will fix it.  But it is my intention that he be given

12   45 years imprisonment.

13           It is further ordered the defendant shall pay

14   restitution in an amount to be determined at the restitution

15   hearing, which will be set within 90 days and I've already set

16   it for August 8th.

17           During the period of incarceration -- well, I don't

18   need to set the period of incarceration because he's not there

19   yet.  We haven't set it.

20           Upon release from imprisonment, the defendant shall be

21   placed on supervised release for a term of life which consists

22   of terms of life as to each of Counts 1 through 6, each count to

23   be served concurrently.  Within 72 hours of release, the

24   defendant shall report in person to the probation office in the

25   district where released.  While on supervised release, the

1    defendant shall not commit any crimes, shall be prohibited from

2    possessing a firearm or other dangerous device, shall not

3    possess a controlled substance, shall cooperate in the

4    collection of DNA, and shall comply with the standard conditions

5    of supervised release including the following special

6    conditions:

7           Permissible computer examination, data encryption

8    restriction, computer modem restriction, employer computer

9    restriction disclosure, no contact with minors, no involvement

10   in youth organizations, sex offender treatment, restricted from

11   possession of sexual materials, Adam Walsh Act search

12   conditions, sex offender registration and permissible search as

13   noted in part G, I believe it is, of the presentence

14   investigation.

15          It is further ordered the defendant shall pay

16   immediately to the United States a special assessment of $100 as

17   to each of Counts 1 through 6 for a total of $600.

18          The total sentence: 540 months imprisonment, life

19   supervised release, $600 special assessment, restitution to be

20   determined.

21          Now that sentence has been imposed, does the defendant

22   or his counsel object to the court's finding of fact or the

23   manner in which sentence was pronounced?

24          MS. BIRCH:  No, Your Honor.  At this time I just would

25   like to renew my two previous objections regarding the PSI.

1    THE COURT:  Those objections will be renewed and my

2    orders will be reaffirmed.

3    MS. BIRCH:  And I also would like to object to the

4    reasonableness of the 540 month sentence.

5    THE COURT:  Okay.  You have the right to appeal the

6    sentence imposed.  Any notice of appeal must be filed within 14

7    days after the entry of the judgment.  If you're unable to pay

8    the cost of the appeal, you may apply for leave to appeal in

9    forma pauperis.

10   Good luck to you, sir.  We'll be in recess on this

11   case.

12   Excuse me, Penny.  Did you want any particular place of

13   incarceration?

14   MS. BIRCH:  I'm sorry, Judge.  We failed to do it

15   during the interview.

16   THE COURT:  Tell me where.

17   MS. BIRCH:  As close to Northeast Ohio as possible

18   where his family -- northwest, I'm sorry.  Northwest Ohio.

19   THE COURT:  I will put in my formal order -- I don't

20   know where all the prisons are up there, but I will put in  my

21   formal order that the defendant requests, and the court will

22   recommend to the Bureau of Prisons, that he be incarcerated as

23   close to northwest -- in or as close to Northwestern Ohio as is

24   possible, commensurate with his background and the offense of

25   which he stands convicted.

1          All right?  Anything further?

2          MS. BIRCH:  No, Your Honor.

3          THE COURT:  If not, we'll be in recess.

4

5          (PROCEEDINGS CONCLUDED)
                    * * * * *

6
                    C E R T I F I C A T E
7    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

8
     6-7-2016                    /s/ Dawn M. Savino
9    Date                       DAWN M. SAVINO, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER